**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 11 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOHN VERNON WILLIAMS,

Defendant-Appellant.

No. 00-4173

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 99-CR-322-C)**

---

Diana Hagen (Paul M. Warner, United States Attorney, with her on the brief), Assistant United States Attorney, Salt Lake City, Utah, for Plaintiff-Appellee.

Richard P. Mauro, Salt Lake City, Utah, for Defendant-Appellant.

---

Before **TACHA**, Chief Circuit Judge, **BRORBY**, Senior Circuit Judge, and **RUSSELL**[*], District Judge.

---

**BRORBY**, Senior Circuit Judge.

---

[*] The Honorable David L. Russell, United States District Judge for the Western District of Oklahoma, sitting by designation.

John Vernon Williams pled guilty to two counts of making false statements to a financial institution in violation of 18 U.S.C. § 1014, and two counts of mail fraud in violation of 18 U.S.C. § 1341. After determining he intended more than $70,000 in loss to his victims, the district court sentenced Mr. Williams to five months in prison. The district court also ordered Mr. Williams to pay $67,061.17 in restitution. On appeal, Mr. Williams argues the district court incorrectly calculated intended loss by including a loan that was not related to his crimes and by failing to consider valuable security. For substantially the same reasons, Mr. Williams also challenges the restitution order. Our jurisdiction arises under 28 U.S.C. § 1291. After careful consideration we reverse and remand for re-sentencing.

## BACKGROUND

Mr. Williams operated a car restoration shop. When Mr. Williams encountered financial difficulty in 1993 he approached John Stockton, one of his customers, and asked for a loan. Mr. Stockton agreed to lend Mr. Williams $60,000 for one year at an interest rate of eight percent. The two men agreed Mr. Williams would pledge as collateral for the loan his Jaguar XJS Convertible sports car and a variety of car repair tools in his shop. Mr. Williams prepared a letter describing the loan agreement and pledged security. The letter listed the

value of Mr. Williams' Jaguar as $40,000. The letter also itemized the pledged tools listing the alleged value of each. The letter described the combined value of the pledged Jaguar and tools as $99,200.[1] Finally, the letter stated: "enclosed and being used to secure the loan will be the title to my 1989 Jaguar XJS convertible."

Unbeknownst to Mr. Stockton, Mr. Williams did not own his Jaguar convertible outright. Mr. Williams had obtained the title to the Jaguar through a bank mistake, even though he still owed money on it. Nevertheless, Mr. Williams told Mr. Stockton he owned the Jaguar free and clear. Mr. Williams gave the title to Mr. Stockton to secure the loan. Mr. Williams did not repay the $60,000. Over the course of several years he made only two payments of $200 each.

After providing Mr. Stockton with the title to the Jaguar, Mr. Williams contacted the Michigan Department of State and applied by mail for a duplicate car title. Mr. Williams informed the Bureau his car title had been lost and

---

[1] We note the letter appears to incorrectly calculate the itemized value of the tools. The listed value of all tools and the Jaguar adds up to only $99,100 rather than $99,200. The list also appears to double count "two engine stands" valued at $600. Neither party addresses these inconsistencies, and we see no need to do so *sua sponte* on appeal.

induced them to send the duplicate title through the United States mail. Using the duplicate title, Mr. Williams obtained another loan secured by the Jaguar from Zions First National Bank. Mr. Williams turned over the duplicate car title to the bank but did not tell them about Mr. Stockton's prior loan and security interest in the car.

Next, Mr. Williams again used the duplicate title to obtain a third loan on the Jaguar from Salt Lake City Credit Union. Mr. Williams informed the credit union about the loan from Zions First National Bank, but did not inform the credit union about the loan from Mr. Stockton. Eventually, Mr. Williams moved to Hawaii, stopped making payments on the credit union loan, and took the Jaguar with him. Salt Lake City Credit Union hired a repossession service in Hawaii which seized the Jaguar and sold it at auction. The credit union reported a deficiency of $7,061.17 in debt not recovered from the sale of the Jaguar.

A grand jury subsequently indicted Mr. Williams on two counts of making false statements to a financial institution and two counts of mail fraud. Mr. Williams pled guilty to all four counts. The district court held the intended loss to Mr. Stockton was relevant conduct in determining Mr. Williams' offense level under the Sentencing Guidelines. The district court also ordered Mr. Williams to

pay $60,000 in restitution to Mr. Stockton and $7,061.17 to the Salt Lake City Credit Union. Mr. Williams then filed this appeal challenging the district court's calculation of loss under the Sentencing Guidelines as well as the restitution order.

**DISCUSSION**

**I. Sentencing**

Mr. Williams' challenge to the district court's calculation of loss raises two issues on appeal: (1) whether the district court erred in treating Mr. Williams' unpaid debt to Mr. Stockton as relevant conduct under the Sentencing Guidelines, and (2) whether the district court erred in failing to consider the value of the pledged tools in calculating Mr. Williams' intended loss. "On appeal, we review the district court's legal interpretation of the guidelines de novo, and review its findings of fact for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Burridge*, 191 F.3d 1297, 1301 (10th Cir. 1999) (quotation marks, alterations, and citations omitted). We accept the district courts factual findings "unless the record does not support them or unless 'after reviewing all the evidence, we are left with the definite and firm conviction that a mistake has been made.'" *United States v. Nichols*, 229 F.3d 975, 978 (10th Cir. 2000) (quoting *United States v. McAlpine*, 32 F.3d 484,

488 (10th Cir. 1994)).

Initially, Mr. Williams argues the district court erred "in including the Stockton loan in the amount of loss, because [Mr.] Stockton was not harmed by [Mr.] Williams' scheme to defraud the banks by improperly procuring certificates of title and by omitting references to the Stockton loan on bank applications."  At the time of Mr. Williams' sentencing, the Sentencing Guidelines provided for a six level increase in the base offense for fraud or deceit crimes causing more than $70,000 of loss.  United States Sentencing Commission, *Guidelines Manual* (U.S.S.G.), § 2F1.1(b)(1)(G) (Nov. 1998).[2]  Because 2F1.1 offenses are subject to grouping under § 3D1.2(d), the Guidelines instruct the district court to consider relevant conduct that was "part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).  *See also id.* at § 3D1.2(d).  Offenses may qualify as part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion

---

[2]  The United States Sentencing Commission deleted § 2F1.1 and consolidated it with § 2B1.1 effective November 1, 2001.  U.S.S.G. § 2F1.1, historical note (Nov. 2001).  However, in general, we apply the Guidelines provisions in effect at the time of sentencing.  U.S.S.G. § 1B1.11(a) (Nov. 1998); *United States v. Kissick*, 69 F.3d 1048, 1052 (10th Cir. 1995).  The district court sentenced Mr. Williams on October 10, 2000.  The 1998 version of the Manual was still in effect at this time.  Accordingly, all citations in this opinion are to the 1998 Guidelines Manual unless specified otherwise.

that they are part of a single episode, spree, or ongoing series of offenses." *Id.* at § 1B1.3, comment. (n.9(B)). "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *Id.* at § 1B1.3 comment. (n.9(A)). "We have interpreted this language to mean that if the conduct is sufficiently similar and within the same temporal proximity, it may be considered relevant for purposes of determining the guideline range." *United States v. McClelland*, 141 F.3d 967, 973 (10th Cir. 1998).

Mr. Williams' efforts to defraud his creditors exhibited multiple common factors and similarities. He obtained the loan from Mr. Stockton by falsely professing unencumbered ownership of the Jaguar and providing a car title which was unlawfully in his possession. Mr. Williams obtained loans secured by the Jaguar from Zions First National Bank and Salt Lake City Credit Union using a fraudulently obtained duplicate title. In obtaining the bank and credit union loans, Mr. Williams again falsely professed unencumbered ownership of the Jaguar. Although the government did not indict Mr. Williams for his behavior in obtaining the loan from Mr. Stockton, "[i]t is well established that sentencing calculations can include as relevant conduct actions that do not lead to separate

convictions." *Burridge*, 191 F.3d at 1304. In obtaining all three loans, Mr. Williams made the same false representations of free and clear ownership of an automobile. All three loans were secured by the same Jaguar convertible. Morever, in obtaining each loan, Mr. Williams used unlawful possession of car title documents to induce the trust of his creditors. These facts are sufficient to support an inference of an ongoing series of offenses, common purpose, and common modus operandi. Under these circumstances we conclude the district court did not commit clear error in finding the debt to Mr. Stockton was relevant conduct for purposes of calculating loss under the Guidelines.

Mr. Williams also argues the district court erred in failing to consider the value of pledged collateral in calculating loss. In particular, Mr. Williams asserts the "pledged tools valued at approximately $60,000 ... should have been subtracted from the Stockton loan in determining loss." In fraudulent loan application cases the Guidelines allow sentencing courts to calculate loss either through determining the actual loss to the victims or the loss intended by the defendant. USSG § 2F1.1 comment. (n.8(b)). "[W]here the intended loss is greater than actual loss, the intended loss is to be used." *Id.* "The reason the intended loss figure is used, even if it is significantly greater than actual loss, is to measure the magnitude of the crime at the time it was committed." *Nichols*,

229 F.3d at 979.

To meet the requirements of the Guidelines, the record must support by a preponderance of the evidence the conclusion Mr. Williams realistically intended a particular loss, or that a loss in that amount was probable. *Id*.; *United States v. Smith*, 951 F.2d 1164, 1168 (10th Cir. 1991). While pledged assets recovered by a creditor should be deducted from the calculation of actual loss, recovered assets are not automatically deducted from intended loss. *See Burridge*, 191 F.3d at 1303 ("[T]he net loss approach is limited to calculations of *actual* loss."); *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir. 1998) (explaining "[t]he fact that the victims have been able to recover part of their loss after the discovery of the fraud does not diminish [the defendant's] culpability and responsibility for purposes of sentencing"). Moreover, we have upheld a finding of intended loss of an entire loan amount where the record indicated the defendant intended to permanently deprive the lender of security by concealing pledged collateral. *See United States v. Banta*, 127 F.3d 982, 984 (10th Cir. 1997) (upholding intended loss calculation without subtracting value of concealed cars). Nevertheless, "[t]he security of [a] loan is a valid consideration in evaluating a defendant's realistic intent and the probability of inflicting the loss." *Nichols*, 229 F.3d at 980.

After paying only $400 on his $60,000 principal, Mr. Williams transported the Jaguar pledged to Mr. Stockton from Salt Lake City to Hawaii. From this evidence, the district court could conclude Mr. Williams intended to permanently deprive Mr. Stockton of the Jaguar. For this reason, the district court did not clearly err in refusing to subtract the value of the Jaguar from its calculation of intended loss.

However, the district court did not make any findings with respect to the tools that were also pledged as collateral. Mr. Williams alleges these tools are worth approximately $60,000. The record on appeal does not disclose where these tools are, who is in possession of them, or whether Mr. Williams' appraisal of the tools' value is correct. Because there is no evidence at all, there is also no evidence Mr. Williams intended to conceal the tools or to permanently deprive Mr. Stockton of their value. It is uncontroverted Mr. Williams made false representations to Mr. Stockton in obtaining the loan. "The fact that the loan was made under these circumstances, however, does not mean that [Mr. Williams] intended to deprive [Mr. Stockton] of the full amount of the loan." *Nichols*, 229 F.3d at 980. The determination of the loss Mr. Williams intended with no reference to the tools he pledged leaves us with "the definite and firm conviction that a mistake has been made." *Nichols*, 229 F.3d at 978 (quotation marks and

citation omitted). The value of the tools, their location, and Mr. Williams'

actions in respect to them are all indicative of his intentions. Because the district

court calculated intended loss under § 2F1.1 without reference to the pledged

tools, Mr. Williams' sentence is clearly erroneous.

## II.  Restitution

Mr. Williams' challenge to the district court's restitution order raises two

additional issues:  (1) whether under 18 U.S.C. § 3663A Mr. Stockton was a

victim harmed in the course of Mr. Williams' scheme of mail fraud; and (2)

whether the district court erred in calculating the restitution amount by adopting

flawed credit union records and by failing to consider the value of the pledged

tools.

Mr. Williams argues ordering restitution to Mr. Stockton was inappropriate

because Mr. Stockton was "not a victim as contemplated by the charges which

address actions taken against the bank, not against [Mr.] Stockton."  The

Mandatory Victims' Restitution Act requires district courts to grant restitution to

the victims of property crimes set out in title 18 of the U.S. Code "including any

offense committed by fraud or deceit."  18 U.S.C. §§ 3663A(a)(1),

3663A(c)(1)(A)(ii).  Under § 3663A,

> the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

*Id*. at § 3663A(a)(2). We have held "[t]he essential elements of fraud under 18 U.S.C. § 1341 are (1) the devising of a scheme either to (a) defraud or (b) obtain money through false or fraudulent pretenses, representations, or promises; (2) a specific intent to defraud; and (3) the use of the United States mails to execute the scheme." *United States v. Deters*, 184 F.3d 1253, 1257 (10th Cir. 1999).

Mr. Stockton was directly harmed in the course of Mr. Williams' scheme to defraud creditors through misrepresentations about the Jaguar. Just as Mr. Williams lied to Zion's First National Bank and Salt Lake City Credit Union about the existence of prior loans secured by the Jaguar, Mr. Williams also lied to Mr. Stockton. Moreover, Mr. Stockton was directly injured by Mr. Williams' scheme of providing creditors with duplicate car titles. If Mr. Williams had not obtained a duplicate car title through the mail, then Mr. Williams would not have been able to fraudulently over-leverage his car to Mr. Stockton's disadvantage. Mr. Williams' false statements to Mr. Stockton regarding outright ownership of the Jaguar are indicative of a "scheme to keep his assets from his creditors and to keep those assets for himself." *United States v. Lawrence*, 189 F.3d 838, 846-47

(9th Cir. 1999) (allowing restitution for "related conduct for which the defendant was not convicted" based on mail fraud conviction).[3]  Because a scheme was an essential element of Mr. Williams' mail fraud conviction, the district court was authorized to award restitution to Mr. Stockton for losses incurred within the course of that scheme.  *See United States v. Berger*, 251 F.3d 894, 899 n.2 (10th Cir. 2001) ("[R]estitution [can] be ordered for the broader scheme to defraud alleged in a mail fraud count.").  Therefore, we hold the district court did not err in ordering Mr. Williams to pay restitution to Mr. Stockton.

However, Mr. Williams also disputes the amount of restitution.  "[A]

---

[3]  Citing *United States v. Meksian*, 170 F.3d 1260, 1261-63 (9th Cir. 1999), Mr. Williams also argues Mr. Stockton's failure to pursue civil remedies was an intervening cause precluding restitution for his losses.  In *Meksian*, an entrepreneur misrepresented his income in order to obtain a small business loan for the purchase of a gas station.  *Id.* at 1261.  After the entrepreneur defaulted, the bank discovered toxic waste on the property, making the collateral worthless.  *Id.* at 1261-62.  The Ninth Circuit reasoned the toxic waste was "not directly related" to the entrepreneur's misrepresentation, and therefore a restitution order awarding the full amount of the loan was not justified.  *Id.* at 1263.  However, Mr. Stockton's failure to pursue civil remedies was directly related to Mr. Williams' scheme to defraud his creditors.  Had Mr. Williams not skipped town, concealed the Jaguar in Hawaii, and fraudulently fastened two subsequent liens on the car, Mr. Stockton may have been more forthcoming in litigation.  Furthermore, it is well settled restitution orders need not "offset losses by amounts that could have been avoided through proper mitigation."  *United States v. Grissom*, 44 F.3d 1507, 1515 (10th Cir.), *cert. denied*, 514 U.S. 1076 (1995); *United States v. Soderling*, 970 F.2d 529, 534 n.10 (9th Cir. 1992), *cert. denied*, 508 U.S. 952 (1993).

restitution order must be specific in a dollar amount that is supported by evidence in the record." *United States v. Julian*, 242 F.3d 1245, 1248 (10th Cir. 2001). "A restitution order entered without proof of loss is clearly erroneous." *United States v. Smith*, 156 F.3d 1046, 1057 (10th Cir. 1998), *cert. denied*, 525 U.S. 1090 (1999). Nevertheless, we have also held "[t]he determination of an appropriate restitution is by nature an inexact science." *United States v. Teehee*, 893 F.2d 271, 274 (10th Cir. 1990).

Initially, Mr. Williams argues a discrepancy of $1,050.38 in credit union records lead to an uncorrected error in the restitution award. Mr. Williams explains credit union documents showed an outstanding loan balance of $17,710.88. The credit union sold the Jaguar for $11,700.09, presumably leaving a loan deficiency of $6,010.79. However, the credit union reported a final loan deficiency of $7,061.17. The presentence investigator recommended including this amount in the restitution order and the district court agreed. The government points out Mr. Williams' characterization of the loan balance as $17,710.88 was taken from a document prepared in mid-April, 1997. The car was not sold at auction until July 9, 1997. Accrued interest at the contract rate of 9.5 percent during the intervening time period as well as credit union expenses and fees incurred in the repossession and sale of the Jaguar reasonably account for the

alleged discrepancy. Under these circumstances, we cannot hold the district court clearly erred in awarding $7,061.17 restitution to Salt Lake City Credit Union.[4]

More troubling is whether the district court considered recovery of pledged tools in calculating restitution. Once again we note the record on appeal does not disclose where these tools are, who is in possession of them, or what their actual value is. Because the contract between Mr. Williams and Mr. Stockton appears to grant Mr. Stockton ownership of these tools in the event of default, evaluation of Mr. Stockton's losses without considering whether Mr. Stockton recovered the tools is necessarily incomplete. Although calculating restitution is an inexact science, the record provides no support for passing over the tools which are by Mr. Williams' estimate worth almost as much as the entire restitution award itself. For this reason we vacate the restitution award and remand for the district court to consider whether the tools should affect the restitution order, and if so, to what

_____

[4] Mr. Williams also argues the district court erred by not considering the alleged discrepancy in the credit union's records in calculating loss under the Sentencing Guidelines. However, because intended loss was greater than actual loss, the district court correctly did not rely on the credit union's deficiency after the car was sold at auction. Instead the district court calculated intended loss to the credit union based on the amount owing when Mr. Williams stopped making payments, moved to Hawaii, and concealed the car. *See Banta*, 127 F.3d at 984. For this reason, the alleged discrepancy in the credit union's records was not relevant for sentencing purposes.

extent.

Because we are concerned about the district court's failure to consider the tools pledged as collateral on the loan from Mr. Stockton, Mr. Williams' sentence is **REVERSED**, the restitution order is **VACATED**, and the appeal is **REMANDED** for proceedings consistent with this opinion.